Good morning. May it please the Court, Theodore Hadjiantich on behalf of Building Industry Association of the Bay Area and Bay Planning Coalition, the appellants in this case. I reserve two minutes for rebuttal. Your Honors, this is a straightforward statutory interpretation case. The substantive issue is whether the government must weigh the conservation benefits against the economic impacts of designating any particular area as part of critical habitat under Section 4B2 of the Endangered Species Act. Before you get into that, could you help me out with something, please? Just explain the concept of how your client is injured by this designation. What's the harm? What are your damages? Just help me understand that. The critical habitat designation virtually designates the entire west coast of the United States as critical habitat for the green sturgeon. From the northernmost tip of the state of California to the middle of California at Monterey. Our clients are injured in two respects. They're commercial residential builders? Building Industry Association of the Bay Area are primarily residential builders. They're injured in two respects. Before they can develop any particular area that's subject to the critical habitat designation, they have to go through a series of governmental approvals under the ESA, which requires consultation with the National Marine Fishery Service to ensure that critical habitat is not disturbed. What that means- This extra permitting pertains to building along waterways or any place? It pertains to building along the shoreline on the ocean, but also to hundreds of square miles of estuarine system inland and riverine systems going inland as well. What it comes down to, is that if a drainage ditch is in a designated critical habitat area, in order to clean out that drainage ditch, the approvals have to be obtained from the National Marine Fishery Service. It's at that level of detail. The substance of your argument is that this is just raising the cost of construction up and down the coast? It's raising the cost of construction, but also two things, delaying the development. Which raises costs? Yes, but it takes years sometimes to go through the biological opinion. It's a multidisciplinary document created by the agency that the agency uses to determine whether or not critical habitat is going to be disturbed. The biological opinion literally can take years before even a drainage ditch can be cleaned. Your honors, the substantive issue is key, but there's a threshold issue that the government raised, and that is one of reviewability. Decisions regarding which areas to include or exclude from critical habitat are reviewable regardless of outcome. The district court here held that while decisions to exclude areas from critical habitat based on economic impacts are reviewable, decisions to include areas as part of critical habitat, regardless of economic impacts, are not reviewable, and neither the statutory language nor the case law supports such a holding. The presumption is that any agency action is subject to judicial review unless there's clear and convincing evidence of a contrary intent on the part of Congress. Here, section 4B2, the operative section, does not bar judicial review for critical habitat designations, and neither does any other provision of the Endangered Species Act. So on the issue of reviewability, the only issue remaining is that which was addressed in Heckler v. Cheney by the Supreme Court, and that is, is there any law to be applied here by reviewing court, and the answer is yes. Courts can review critical habitat decisions readily by applying the Administrative Procedure Act standards. On the one hand, abuse of discretion, and on the other hand, whether the agency took action without observing procedure required by law. In either case, the government is required to show its work, and that's crucial. Not merely to say that it did the work, but to show how it did the work. If the record doesn't support the action taken, or if the action violates a non-discretionary procedural requirement, the agency has exceeded its power or abused its discretion, and those are standards of review that the courts have applied for decades. In a variety of cases, they can also be applied here. Critical habitat decisions are certainly reviewable, regardless of whether the decision is to leave areas in, or to leave areas out of critical habitat. There's an interesting and telling corollary to the reviewability issue. The government states in the 4B2 report that economic impacts could never outweigh biological benefits in high conservation value areas, but in sharp contrast to how economic impacts are handled, when it comes to national security and relations with Native American tribes, high conservation value areas were handled very, very differently. There were six Native American tribal lands that were designated as high conservation. All six of those areas were excluded from critical habitat designation. That exclusion totaled more than 1,813 shoreline miles of high conservation value areas. By the same token, the Department of Defense facility on Mare Island was classified as a high value area, yet it also was excluded from critical habitat designation based on national security considerations. The service never explained in the administrative record why high value areas were too important for species to be even considered for exclusion based on economic impacts, while they were not too important for exclusion based on tribal and Defense Department impacts. The appellants raised that important issue in their opening brief, yet neither the government nor the Center for Biological Diversity addressed that issue in their opposition briefs. Accordingly, there's no rational connection that's been made between the facts found and the choices made that explains the disparate treatment accorded to high value areas. Under the Administrative Procedure Act, the failure to explain that disparity is fatal. In other words, the government has not shown its work. Your honors, it is that inconsistency in the government's to high value areas that lies at the heart of the government's efforts to argue that refusing to balance the benefits in any particular area is discretionary and is not even reviewable for abuse of discretion. I turn now to the substantive issue at hand, and that is whether the service violated Section 4b-2 when it designated critical habitat for the green sturgeon. The answer is yes, and the answer is keyed into the specific statutory language of Section 4b-2, which is reproduced in the appellant's opening brief on page 12. For convenience, your honors may want to open up to page 12 of the appellant's opening brief as we work through the statutory language. There are only two sentences in Section 4b-2. The first sentence says, the secretary shall designate critical habitat after taking into consideration the economic impact of specifying any particular area as critical habitat, and the term any particular area is crucial here. Now the Supreme Court in Bennett v. Speer construed that first sentence to mean that there is a non-discretionary duty on the part of the government to consider economic impacts before designating any particular area as critical requirement. But there was a question left open by Bennett v. Speer, and that question is, what is the procedure the government must use in considering economic impacts? That question is answered in the second sentence. But here, I'm not sure where this argument is going because as I read the record here, the agency paid a good deal of attention to the economic impact. It's not like it ignored it. That's correct, your honor. And what the record reflects is the critical habitat designation rests on three pillars. First is the biological report. In the biological report, essentially area by area determines the conservation benefits of designating critical habitat in any particular area. Biological report does not balance the benefits. Then there's the economic report. I don't see in the language of the statute where it says that in the designation of an area as critical habitat, it has to balance the benefits of exclusion versus the benefits of designation. That only comes in the second sentence, which really speaks to the decision as to whether to exclude an area. The balancing test is set forth in the second sentence. It's the one issue that Bennett v. Speer did not address, and that is, what's the procedure or methodology that the government has to use? I don't think we need to look to Bennett v. Speer because we're talking about plain language of the statute. So if balancing of benefits versus cost, then it would have written that into the first sentence as well, wouldn't it? Not necessarily, your honor, with respect. What the second sentence does is it designates the methodology by which economic impacts are going to be considered. The language, the secretary may exclude any area from critical habitat if he determines that the benefits of specifying such area as part of critical habitat. Just as a matter of logic, inclusion and exclusion decisions are part of one and the same analytical process. The question becomes, what's left in and what's left out? Whatever is left out is left in. Whatever is left in is left out. It's one and the same analytical process. So exclusion decisions necessarily impact what's going to be left in as part of critical habitat. And inclusion decisions also define what's going to be left in and what's going to be left out. They're two sides of the same coin. You want to save some time for rebuttal? Yes, thank you, your honor. May it please the court, I am David Shilton representing the National Marine Fisheries Service. I plan to cede four minutes of my time to Emily Jeffers who represents the Intervenor Center for Biological Diversity. I do think that the plain language of the statute does resolve this case. The first sentence of section 4B2 says that the secretary shall designate critical habitat after considering economic impact, national defense, and other impacts. But it doesn't say how the Marine Fisheries Service must do that. It leaves the method for considering economic impacts with the discretion of the agency. Here the service did thoroughly consider economic impacts for all of the sub areas. It broke this down into 41 sub areas. And it also looked at the conservation value of each area. And then it went on to do what sentence 2 allows it to do. Sentence 2 is very different. It's a discretionary. It says the secretary may exclude any area from critical habitat if he determines that the benefits of exclusion would outweigh the benefits of specifying it, although he can't do that if it would cause extinction. Now that's in contrast to the first sentence is discretionary. And it doesn't modify the duty in the first sentence. It doesn't say that this weighing has to be done in every case or that it's necessarily part of the economic analysis. It just says that the secretary may choose to exclude areas if he makes his finding that the exclusion would outweigh the benefits. So the service in this case looked at all of the areas. It did consider whether to exclude them. And at the end of the day, it decided that 14 of the 41 areas were appropriate to be excluded because the economic effects outweighed the conservation value. But for the others, there was no outweighing. The plaintiffs have really just focused on one category. And that is the high conservation value areas. For those areas, the service said looking at the value of those areas to exclude them would significantly impede the conservation of the green sturgeon. And that would be contrary to the statute. So we won't exclude those areas. But areas that were determined to have a medium or low or ultra low conservation value, they were eligible for exclusion. And as I say, 14 of them ultimately were excluded. And the service explained its judgments for all of these matters. It did explain why it did not exclude high conservation value areas. And that is because the conservation value was so important that it outweighed economic impacts. These were spawning areas. The green sturgeon spawns only in the Sacramento River. It turns out we later found that there was a bit of spawning in the Lower Feather River, but that was not known at the time. And so it's critical to designate this area if you're going to conserve the green sturgeon. Let me ask you just a somewhat tangential question. So I'm sure I'm trying to absorb the background of the statute because we don't really see that many back east. But are there other endangered species in the same area? There are. For instance, salmon. There's several species of Pacific salmon that are endangered and share similar critical habitat. So if you were building adjacent to the Sacramento River, your costs are not materially increased because green sturgeon is added to the list? The service looked at that very issue and it said, you know, our economic impacts that we've set out here are probably overstated because it's likely that any restriction on development would already be in place because of these other critical habitat. But we'll go ahead and make that conservative assumption, basically giving the plaintiff the benefit of the doubt that these costs would stem from this particular designation. So you're right, there are overlapping designations. I would also want to make clear that the economic effect of designating critical habitat, it has no direct effect on private developers. It's only when a private developer has to get federal permission from a federal agency. In that case, section 7 of the Endangered Species Act says that a federal agency can only approve a project, well, it can't approve a project if it would adversely modify critical habitat. So if a developer, you know, wants to get a Corps of Engineers dredge and fill permit, then the Corps of Engineers has to consult with the National Marine Fisheries Service and they'll try and come up with a way to avoid adverse modification. If they can't, then the developer may have to change its project and that may have some cost. But it's a very indirect sort of cost. But that's how the service calculated its costs here. And then it did compare the costs against the benefits. It's simply the problem the plaintiffs have is for these high conservation value areas, the service did not set a monetary threshold above which the cost could outweigh the value. But there's nothing in the statute that says that the service has to proceed by establishing monetary thresholds. And so if there were any doubt from the statutory language, the relevant House report on the 1978 amendments stresses that the consideration and weight that the service gives to any particular factor is completely within the service's discretion. So Congress here, you know, didn't change its ultimate purpose in the Endangered Species Act to preserve endangered species from extinction and to bring them back from the brink of extinction. It simply said, you know, for critical habitat designations, we want to make sure that the service first looks at economic impact. And if it's possible to exclude areas without, you know, damaging the ultimate purpose of the act, then it should do that so that, you know, we don't have cost inefficiencies. So let's say I wanted to build a Four Seasons on the edge of the Sacramento River. How would this designation complicate my life? Well, as long as you didn't have any building within the river or its bank, you would have no problem. I want to go right up to the river's edge and I'm going to have a bar on the river. You know, if you have to put some pilings in the riverbed for that bar, then that would require a permit from the Corps of Engineers because it's in waters of the United States. And then the Corps would consult with the National Marine Fisheries Service and would ask, does this adversely modify the critical habitat? The Corps might say, no, it doesn't. Go ahead. Or the National Marine Fisheries Service may tell the Corps, you know, as proposed, that would adversely modify. But we think if you use this other construction method, it won't. And so that's what you would need to do to avoid adverse modifications. So as the builder, do I have to go to Marine Fisheries to get an extra license? No, you don't. I go directly with the Corps and the Corps negotiates out the intrusion issues, if you will, with your client. Right. So, again, the service considered all of these impacts and explained its decisions. As to the Department of the National Security exclusions and the Indian lands exclusions, the service also explained why it was appropriate for it to exclude those items. The national defense items are quite small. They are like the Mayor Island Reserve that was mentioned, you know, several piers in San Pablo Bay. To exclude those from critical habitat, the service found, would not have a significant adverse effect on the green sturgeon's conservation because it is a small area and because the Navy has plans in place to protect them. So that was appropriate. Same way with Indian lands, the service looked at those and found that, again, they were small, didn't seem to affect the green sturgeon in a significant way. So that was appropriate. A lot of those rights arise out of treaty, do they not? In California, there are, I think, fewer treaty rights issues than in the Pacific Northwest, but ultimately they do. A lot of them are rancherias that come from executive orders. But, yes, there are important Indian rights that the service respected here. Do you concede that the Building Industry Association has standing in this case? We did not argue that they lack Article III standing based on potential economic impacts. We made a point about the National Environmental Policy Act that they didn't come within the zone of interest. But I think for NEPA, these plaintiffs have said that they are simply preserving the NEPA issue for possible end-bank because of this court's ruling in the Douglas County right. Unless there are other questions, I will give the rest of my time to the intervener. Well, that's the first I've heard of Douglas County. Great case. We think that it's binding. That was a case that I decided 20 years ago. May it please the court. I'm still here. Emily Jeffers for the Center for Biological Diversity. I'd like to make two very brief points regarding Appellant's Endangered Species Act claims. The first is that we agree with the Fishery Service and the District Court that Section 4B2 only requires the Secretary to make economic impacts into consideration when designating critical habitat. The manner of this consideration is not dictated by the second sentence of Section 4B2. The balancing test in the second sentence of 4B2 is instead intended as a safeguard when the Secretary is making the discretionary decision to exclude areas from critical habitat. In this case, there's ample evidence in the record that the Fishery Service considered economic impacts... You have to keep your voice up a little, huh? ...when it designated the critical habitat, including for all those areas which have high conservation value. For example, in the final economic analysis at AR 5043 to 5045, a graph illustrates the annualized economic costs of including each area in the critical habitat, including the high conservation value areas. Ultimately, these areas were included due to their importance to the green sturgeon. For many of them, the Fishery Service found that without these areas, the green sturgeon was unlikely to survive. Appellants concede that the Fishery Service took economic impacts into consideration on page 38 of their opening brief, and the inquiry can and should be settled at this point. However, even if this court decides that the Fishery Service is required to weigh the economic costs of designating critical habitat against the ecological value of doing so, my second point is in this case, the Fishery Service satisfied this higher bar and performed a balancing test. The district court agreed with this conclusion, even though it found it was unnecessary to reach it because a take into consideration analysis is all that is required by statute. I'd like to direct the court's attention to three documents in the administrative record. The first is the final economic analysis at AR 5038. The third is the final 4B2 report at AR 5790. The record shows that the economic analysis determined the cost of including every area in the critical habitat, and the biological report assessed the ecological value of each of these areas. Then, in the final 4B2 report, the Fishery Service balanced the economic costs of designating critical habitat against the ecological benefits of doing so. According to this report, NIMS, quote, weighed the benefits of designation against the benefits of exclusion by comparing the conservation value rating with a range of economic cost estimates. At AR 5816, a graph directly compares the dollar cost against the designated ecological value for each area. And while the agency stated that high conservation value areas would be ineligible for exclusion, this came as a result of comparing these costs and benefits and determining that the conservation values of these areas were so high that no economic cost could outweigh their value to the green sturgeon. In sum, we believe the final rule was properly promulgated, and this court should uphold the district court's ruling. Thank you. Thank you. Your Honors, if I may, just four very brief points. With regard to the second sentence of Section 4B2 and the way in which it interacts with the first sentence, the very process of are going to be included. Exclusion and inclusion result from a concurrent and inextricable analytical process, namely deciding what to leave in and what to leave out. The district court interpreted Section 4B2 to require a balancing of the benefits for areas that are left out, but not for areas that are left in. That makes no sense. Your Honors, when one statutory interpretation leads to absurd results, but another one can avoid such results consistent with the statutory language, the interpretation leading to absurd results should be rejected. With regard to the legislative history, the appellants cite in their brief and cited today one snippet of legislative history that the following. The consideration and weight given to any particular impact is completely within the Secretary's discretion. But the fact that the consideration and weight given to any particular impact is discretionary does not imply that the required procedure for decision making is discretionary. As the Supreme Court said in Bennett v. Speer, it is a rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decision making. Finally, with regard to the 4B2 report, that is the only place in the three reports, biological report, economics report, 4B2 report, that is the only place where the benefits were balanced. And there was a decision rule specifically rejecting a balancing of the benefits insofar as high conservation value areas are concerned. The government is correct in saying that our only complaint here is that high conservation areas did not go through a balance of the benefits. All the other areas did, but because high conservation areas did not, there was no exclusion in section 4B2 allowing the government to designate high conservation areas and say we're not going to balance the benefits there. Thank you, Your Honors. Thank you very much. Thank you. Thank you all. We'll take a brief recess.
judges: Pregerson, Parker, Nguyen